UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

        Case No. 13-CR-59-RTR

DONNA STERNKE,

        Defendant.

## SENTENCING MEMORANDUM

NOW COMES the defendant, Donna Sternke, by her attorneys, BUTING, WILLIAMS & STILLING, S.C., by Attorney Kathleen B. Stilling, to present the following arguments in preparation for sentencing.

### STATEMENT OF THE CASE

On May 23, 2013, Donna Sternke waived her right to be charged by indictment and entered a plea to the single count information charging her with a violation of Title 18, United States Code, Section 666(a)(1)(A). She admitted that between January 1, 2010 and January 1, 2011, she embezzled and converted to her use without authority over $5,000 in money belonging to the Shorewood School District. As part of the plea agreement, Ms. Sternke agreed that she owed restitution in the amount of $310,263.44 to the Shorewood School District and promised to provide the Financial Litigation Unit of the United State's Attorney's Office with financial information and to cooperate with the unit to obtain

1

restitution for her crime. Ms. Sternke has provided the requested information and cooperated fully with the Financial Litigation Unit in identifying assets, liquidating one asset as the government requested and arranging for the orderly disposition of another asset to provide a reliable stream of payments in the future even in the event of her death.

In the plea agreement, the parties agreed on the advisory Sentencing Guidelines applicable to the charge, the lack of criminal history and the relevant offense conduct and the government agreed to recommend a sentence at the bottom of advisory guideline as determined by the court.

United States Probation Officer, Sara Nieling, prepared a Pre-Sentence Report (PSR) and filed it on October 1, 2013. The defense filed several proposed corrections to the report on December 31, 2013, primarily updating and correcting financial information. The PSR highlighted Mrs. Sternke's chaotic childhood, her isolation, anxiety and depression as an adolescent and the heavy responsibilities she assumed at a young age. It also described Mrs. Sternke's close relationship with her husband and children as well as her struggles to care for her ailing and elderly parents. Taking into consideration the provisions of the sentencing guidelines, Ms. Nieling accurately defined Mrs. Sternke's relevant conduct and lack of criminal history and noted that the recommended range of punishment is "18 months to 24 months." (PSR, p. 18) The government has agreed to recommend the bottom of the range or 18 months. Even though the guidelines do not call for probation for individuals for whom the guideline range exceeds ten months, the court may place Mrs. Sternke on probation for

2

a period of up to five years. The defense will ask the court to place Mrs. Sternke on probation with conditions, including home confinement.

In support of Ms. Sternke, defense counsel submits the following.

## **INTRODUCTION**

The individualization of justice is a concept particularly important to our criminal justice system. It is well-settled that the punishment should fit the offender, and not merely the crime. "The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender." *Woodson v. North Carolina*, 428 U.S. 280, 297, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) citing *Williams v. New York,* 337 U.S. 241, 247 (1949). Although the United States Sentencing Commission established a range of criminal sentences, the institution of the Federal Sentencing Guidelines did not eliminate a district court's discretion to sentence an offender based on individual circumstances, *Koon v. United States,* 518 U.S. 81, 113, 116 S.Ct. 2035, 2053 (1996). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Id.* at 113.

The United States Supreme Court reaffirmed the primacy of judicial discretion in sentencing when it excised the statute mandating compliance with the Guidelines. *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 756, 160 L.Ed. 2d 621 (2005). The court held

3

that while judges are to consider the guideline range, they must also consider the other directives set forth in 18 U.S.C. § 3553 (a). *Id.* at 757. Section 3553 (a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." It would constitute procedural error for a court to attach a presumption of reasonableness to the Guidelines range or weigh the Guidelines range more heavily than other § 3553(a) factors. *U.S. v. Collins,* 684 F.3d 873, 888 (9th Cir. 2012); *United States v. Carty*, 520 F.3d 984, 994( 9th Cir. 2008).

§ 3553 (a)(2) states that such purposes are:

( a ) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
( b ) to afford adequate deterrence to criminal conduct;
( c ) to protect the public from further crimes of the defendant; and
( d ) to provide the defendant with needed educational or vocations training, medical care, or other correctional treatment in the most effective manner.

§ 3553(a) further directs sentencing courts to consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4 and 5) sentencing ranges and policies established by the Guidelines; (6) the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; *United States v. Qualls*, 373 F.Supp.2d 873, 877 (E.D.Wis.2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to

4

re-offend."); and (7) the need to provide restitution to any victims of the offense.

## **DONNA STERNKE'S PERSONAL HISTORY**

Donna Sternke is 55 years old and was born and raised on the eastside of Milwaukee near Riverside High School. Her father was a blue collar worker, who worked two jobs to support the family and was often absent. Her father was a veteran and Donna recalls being active as a child and teenager in volunteer work at the VFW Post and other veteran's activities. Donna's mother took in foster children and cared for children of working mothers. Donna was the only child born of the marriage but was raised with the foster children during most of her childhood. She was used to children coming, becoming attached to them and seeing them leave at a moment's notice never to be seen again. This was difficult for her as a young child and gave her a sense that relationships were uncertain and people she loved might disappear without warning.

One foster child, Danny Harold, with whom she became very close, stayed with her family for a long time and remained in contact even after he left their home. When he turned eighteen, he entered military service and was diagnosed while in the service with bone cancer. Having no family, he returned to her parent's home and they cared for him until his death a few months later. Donna was thirteen when she lost her foster brother.

When Donna was still in elementary school, her parents adopted two infant boys and for the first time, Donna had brothers she knew would never leave her family. However, this also meant extra responsibility as she helped her mother to care for her infant brothers in

5

addition to the foster children and day care children in her home. Donna was not permitted to visit friends after school. Her mother felt that her family, which included some cousins who lived nearby, were sufficient for social activities. In addition, Donna was needed at home to help with the family and foster children so after school socializing was rare and Donna had few friends.

Donna attended high school at Dominican High School as a work/study student and worked in the school cafeteria during breaks and the lunch hour to earn money toward her tuition. She struggled academically and socially in school where the bulk of the students were brighter and more well to do and she was defined socially as a "scholarship" student. She began to suffer from anxiety attacks and her family doctor prescribed Valium to help her manage her anxiety. She was isolated and unhappy during much of her high school years.

After graduation, she married Fred Sternke at age nineteen and they had their first daughter less than a year later. Donna and Fred have three daughters and the family is very close. Donna looked at her own childhood and determined to help her daughters to fully realize their potential and to enjoy their childhood. Her daughters Kristy, Kelly and Katie all felt that their childhood was happy and secure and that their mother did everything she could to support them in all their endeavors. Her daughter, Katie, wrote, "No matter how hard something became, or how big of a challenge it was, she was there pushing me, guiding me, and encouraging me the whole way." Kristy wrote, "I was in special education all throughout school. I will never forget all the long hours my mom spent working with me. At every IEP

6

meeting my mom was always there supporting me. I will never forget that." These three young women are now married, working mothers in their early thirties.

Around 1982, when Donna was in her late twenties with three young children, her father became completely disabled. He had suffered from severe arthritis for years and had two hip replacements. At 54, he became unable to perform his job and qualified for social security disability. His wife, who had never worked, was needed at home to care for him. She could no longer care for foster children or have a home daycare as she had in the past and their means were very limited. For the next ten years, Donna and Fred did everything they could to help them stay in their home in Milwaukee, driving the 30 mile round trip to help with doctor visits, shopping, home maintenance and chores. In addition, Donna's parents became more financially dependent on Donna and Fred for groceries, money for medications, repair costs and other necessities. Donna and Fred both worked but the cost of raising their family and helping Donna's parents was a strain on the couple's finances.

Around 1992, the rapid deterioration of her parent's health threatened their ability to live independently and the constant traveling was increasingly difficult so Donna and Fred asked her parents to live with them. They purchased a modest side by side in Slinger for the two families. The parent's home in Milwaukee was "under water" so they rolled the balance of the short sale into the new mortgage. The theory was that her parents would split the mortgage payment but the reality was that the disability payment covered their medical expenses, utilities, food and living expenses without leaving much over for their half of the

7

mortgage. Donna and Fred began to cover the full mortgage and helped her parents with other expenses.

Over the next few years both parents became less mobile, spending more and more time in their wheelchairs. Donna and Fred became more involved in their care in addition to full time jobs and their own children. Financially, they were stretched very thin and the stress of the responsibility was difficult. Donna's brothers neglected or refused to help out financially, saying they had their own bills to cover. Donna's credit card debt rose and rose. This is the backdrop for the offense. While over time Donna spent some of the money she embezzled on non-essential items, a significant portion of the money went to keeping the two households afloat. Although she did spend some of the money on gifts for the children or other non-essentials, they lived and continue to live in a modest way.

In 2004-05, Dona's mother was diagnosed with Alzheimer's disease in addition to other health problems. They tried to keep her in the home with Donna and Fred providing most of the care as her father was wheelchair bound. One day, Donna's mother threatened her husband with a knife, claiming that he had stolen her wedding dress, and she was hospitalized on an emergency basis. The doctor refused to let her return home and she was placed in a nursing home where her husband insisted on joining her. Their entire check went to pay the nursing home and each parent was given an allotment of $45.00 a month for expenses. Needless to say, Donna and Fred continued to pay for clothing, personal products and other needs. Donna is a frequent visitor and, as everyone who has had a loved one in a

8

nursing home knows, frequent contact from family can mean all the difference in the care received. She also makes sure that her own children visit and bring the great-grand children to enrich their hours as much as possible. At this time, both parents suffer from severe dementia and require constant care.

When Donna's parents went to the nursing home, the other side of the home was open. The home had been damaged by the years of exposure to two wheelchairs and the need for various handicap accommodations so repairs were needed before anyone could live there. After Fred and Donna paid for and did the repairs, her daughter, son-in-law and grandson moved in. The plan was that they would split the mortgage but two layoffs in the last 6 years have made this difficult at times. During times when her daughter was in financial difficulties, Donna and Fred took care of the entire mortgage again.

When the irregularities came to light in June, 2011, Donna resigned. She would not discuss the reason with her husband and quickly lapsed into a deep depression. Her husband and children became so concerned that they persuaded her to enter the hospital for treatment. When she was discharged, Donna was calmer but remained deeply depressed for months. She sought counseling to manage her feelings of deep depression. She learned in counseling that her upbringing and family dynamics made it hard for her to share her fears and problems with anyone, including her husband. She learned that her need to take care of problems alone, no matter how overwhelming the circumstances, put her at risk to do something out of character as she did here. Revealing the offense to her family, working in counseling and asking for

9

help has allowed her to become closer to them and removed a great burden. She continues to take medication to manage her depression.

Donna plays an active role in her grand-children's lives. She cares for her grandson, who lives in the adjoining unit and is cognitively disabled, but also the other three grandchildren in rotation to assist all the parents to work. Her disabled grand child has difficulty attaching to adults because of a suspected autism spectrum disorder and his time with Donna provides the security and certainty he needs to function optimally.

After she resigned from the school district and was released from the hospital, Donna turned to her Catholic faith and became more active in her parish church. Her involvement in the church was a source of comfort and support to her. After some time, she was hired as a secretary at her parish church office and quickly became an important member of the staff. Donna is well-liked and respected. The pastoral associate, Paul Rogers, a former chaplain at Dodge Correctional Institution, states, " Mrs. Sternke has been such a positive influence on the atmosphere of the parish office and all the people who come in; it would be difficult not having her here."

After the plea hearing, the church gave notice to the parishioners about Donna's criminal involvement. Contrary to what she feared, Donna received an outpouring of support and was recently given an employment contract for the upcoming year which would involve working in the parish office and adding duties in the school office. Father Rick Stoffel also plans to come to the sentencing and speak on her behalf. Donna's work at the church and

participation in parish life has comforted her and helped her to face the future with greater optimism. She freely expresses her remorse and sadness about her thefts from the school district to her family and friends.

## FACTS OF THE OFFENSE

The thefts came to light while Donna was out of the office and another worker discovered some unusual activity. The district did an audit of all the funds in the unit where Donna worked as a secretary and discovered that over an extended period of time Donna had stolen the money by requesting checks for credit card payments not related to school district expenses, items she had not purchased for the district or items that did not exist. She would then pick up the check and use it for personal expenses or credit card payments. There was very little oversight over her activities or those of other co-workers and the thefts continued for years without any question. There is no dispute about the amount of restitution.

Sixteen months after her resignation, agents from the Department of Education came to her home and confronted her with the evidence. Donna was very cooperative and admitted to the thefts and explained what she had done and identified documents for them. She explained about her family circumstances and her hospitalization for depression. The agents ensured that her husband was notified before they left because of their concern about her mental health history.

# RESTITUTION

Since the federal agents left her home in October, 2012, Donna has been working on a way to repay restitution to the school district. The defense has worked closely with the government to evaluate all the options for restitution and to identify the methods that will best and most reliably restore the funds to the school district. The parties have worked together on the following plan:

1. She and her husband refinanced their home and were able to obtain $40,000 in equity from the home;

2. Mrs. Sternke cashed out her WEA Trust benefit, which after taxes and penalties, yielded $70,000;

3. She is now in the process of applying for the WRS Retirement payments and has chosen a set of options after consultation with the government. She will apply for a life benefit with 10 years of guaranteed payments and will choose an accelerated payment which will yield an increased monthly payment until she reaches 62 years of age. After the sentencing, when the restitution order has been signed, she will sign a voluntary garnishment stipulation directing the WRS to send payments to the Clerk of Courts. The WRS administration has told AUSA Lisa Warwick that they will not consent to a garnishment for the whole check minus deductions but will only allow a 25% deduction despite Mrs. Sternke's express wishes in the matter. If this is the final decision, then Mrs. Sternke will sign a separate payment agreement with the government to submit the balance each month

12

to the Clerk of Courts; and

  4. She is also in the process of making arrangements to secure a continuation of the payments if she dies before the ten years guaranteed payments have been paid. To this end, when she has received the final instructions from the government regarding the wording of the trust, she will list an irrevocable trust as her beneficiary for any WRS payments remaining after her death. The trust will direct the trustee to sign a new garnishment stipulation for the remainder of the payments and to sign a new agreement with the government regarding the balance of the monthly payments. This will guarantee that the payments continue even in the event of her death.

This plan should ensure that the district is paid in the following manner. The projections are not completely accurate but should be fairly close.

1. Payment currently in the firm trust account equals $112,000.00.
2. The WRS accelerated benefit over six plus years should total approximately $120,000.00.
3. The subsequent reduced benefit is projected to pay approximately $10,000,00 per year after age sixty-two. Payment in full would take an additional seven to eight years.

Mrs. Sternke understands that her criminal behavior has also caused intangible harm to the district beyond the monetary loss. To try to address this harm, she has offered to meet with the Department of Education agents and members of the school district to explain what she did in detail so that the district can be better prepared in the future to address loss prevention issues. Agent Pavlakovic stated that he would recommend that the district take advantage of the opportunity to address potential oversight issues in their system.

13

## **SERIOUSNESS OF THE OFFENSE**

The offense in this case is clearly serious. As the pre-sentence writer noted the thefts occurred over a long period of time and the total amount of restitution is large and will take Mrs. Sternke years to fully re-pay.

In mitigation, Mrs. Sternke worked for the district for many years before she turned to theft to cope with the ever increasing debts. She was a good employee who put in extra time and worked hard to maintain a pleasant working atmosphere. It was only when her parent's problems overwhelmed her that she made the decision to take what didn't belong to her to keep things afloat. Although she started out, as many do, thinking that it was a temporary measure and she could repay the money when things improved, things never improved enough. Later, she would use the money to give her family things that she couldn't afford, such as gift cards, gifts, or a TV. All the while, she felt the guilty secret separating her from her family, her friends and even her husband. It was a relief in the end to finally be called upon to acknowledge what she had done and start to make amends. While the theft was serious, it did not originate from a self-indulgent need to gamble or to fund some other addiction, such as drugs or shopping. She used it to keep her parents comfortable and to give her family things she couldn't. While the offense is serious, she is remorseful, needs no additional deterrence and has cooperated to the fullest extent to arrange for restitution for her misdeeds.

Mrs. Sternke has gone to great lengths to arrange for repayment of the loss suffered by the school district. She and her husband re-financed their house to extract all the available equity from the home. She liquidated a retirement benefit after consulting with the government and obtaining their concurrence with the decision and these two actions provide a substantial combined initial payment of $112,000.00. In addition, she has promised to sign a voluntary stipulation for garnishment and payments from her pension during her lifetime, which will include an accelerated payment for the first six plus years. Finally, Mrs. Sternke has arranged for a trust to ensure that the payments continue for their duration even in the event of her death.

Mrs. Sternke's comprehensive steps to obtain as much restitution before sentencing and her decision to arrange for the continuation of the payments after death is extraordinary. It demonstrates her sincere remorse and desire to address the harm she caused. It is highly unusual for a defendant to be concerned about whether restitution payments will continue to be paid after death but, as the government can verify, Mrs. Sternke has expended a great deal of effort to make these arrangements and her husband, who will be the trustee, supports her efforts. The defense asks the court to take this factor into consideration at sentencing. *United States v. Oligmueller*, 198 F.3d 669, 672 citing *United States v, Garlich*, 951 F.2d 161, 163 (Cir. 8th, 1991)( The court may consider a departure based on extraordinary efforts at restitution).

15

## PROTECTION OF THE PUBLIC

In determining the public's need for protection in an individual case, it is important to look at the character and past history of the defendant. By doing so, the court can make some determination about whether incarceration is necessary to ensure that the public will not be harmed.

Mrs. Sternke is a woman with no prior criminal convictions of any kind. She had a difficult childhood and adolescence that left her suffering from depression and a sense of being responsible for everything and everyone. She overcame many personal obstacles to succeed as a mother and a wife. She is well-loved and respected by her daughters, her husband and her parish community. A consistent pattern of volunteer service and helping those around her shows that she is someone who cares for others and wants to do what's right. Her search for faith and redemption speaks to her desire to be honest and true to herself in the future. Her forthright admission of her criminal conduct and her remorse when speaking to her friends and family demonstrates that she is willing to expose her weakness and ask for help. She knows now that this is the only route to real change and peace within herself.

In addition to her personal changes, Mrs. Sternke also has compelling family circumstances that suggest that society would be better served by allowing her to serve a community based sentence. She is still the main caretaker for her elderly parents who both suffer from physical disabilities and advanced dementia. Even though they reside in a nursing

home, she still has primary responsibility for making decisions about their care, visiting them several times a week to make sure they have what they need. Because of the dementia, her parents are not always able to make care givers understand their needs. Mrs. Sternke has been a primary care taker for her parents for many years, understands their needs and communicates them effectively to staff. Because of the dementia, change is very hard for them and they rely on her visits for emotional support. If she were incarcerated, her husband would take over as the power of attorney, however, he would not be able to provide the intangible nurturing that ensures their comfort. In addition, Mrs. Sternke cares for her cognitively disabled grandson and he counts on her steady, unchanging presence on "his" days. His parents could make other arrangements for him but, again, it would not be the same. The special needs of a family is relevant to sentencing, both because incarceration may cause undue harm to innocent third parties and because "the lack of any threat to the community-indeed, the benefit to it.." that would result from the ability of a defendant to care for an ailing loved one. *United States v. Gaskill*, 991 F.2d 82 (Cir. 3rd, 1993)(The community would benefit from allowing the defendant to care for his ailing wife where there were no needs to be served by imprisonment but punishment).

    Mrs. Sternke has committed a crime but does not require incarceration in any form to bring home the message of her wrong-doing; she has made many changes already through openly asking others for help and being honest about her past. The public does not require incarceration for protection.

## REHABILITATION OF THE DEFENDANT

Mrs. Sternke has few rehabilitative which needs which would be addressed by incarceration in the prison system. Before the crime came to light, she badly needed treatment to understand and overcome the effects of her upbringing, which told her that asking for help was wrong and that suppressing her feelings and showing a happy face was the way to handle problems. In her treatment, both in the hospital and out-patient, she identified maladaptive attitudes and behaviors that led her to steal rather than admit that she could no longer carry the burden of two families. She hid the financial problems from her husband, not wanting him to fully understand how caring for her parents had drained their resources. Mrs. Sternke suffered a tremendous amount of guilt at the amount of time and money she needed to care for her parents and felt that she short-changed her children and husband by devoting so much of the family's resources to caring for them. She did not appreciate that her husband would have been fully beside her had he known how worried she was about the finances. Like many people, she thought the theft would be temporary and that she would replace the missing money without her supervisors or her husband realizing what she had done but that day never came. The temptation to deal with every shortfall the same way was always present until the district supervisors finally confronted her.

Now that all the facts are out in the open, Mrs. Sternke has faced her fears about disappointing her family and acknowledged her weaknesses to them and to her community. She discovered that her husband was and will always be her rock no matter what challenge

18

they face and that her daughters are grown women who love her and want to help her the way she always helped them. Her parish community and friends acknowledge her contrition and give their full support to her. By entering treatment over three years ago and consistently working on her fears and facing her errors in thinking, Mrs. Sternke has demonstrated her determination to set things right.

Mrs. Sternke's background in faith, her exemplary behavior in so many areas of life, her recognition of the need for treatment, her diligent work to deal with her psychological issues demonstrate that she takes her problems seriously and realizes that they need to be addressed. There is no doubt that with appropriate structure and treatment as needed, Mrs. Sternke can remain safely in the community.

## SENTENCING RECOMMENDATION

The defense is asking the court to impose and stay a sentence and to place Mrs. Sternke on probation for a period of five years even though the sentencing guidelines do not recognize probation as an appropriate sentence in cases involving this offense level. However, because she originally became involved in the theft due to financial woes relating to caring for her family, has since obtained treatment for the underlying psychological issues, has many responsibilities involving her disabled parents and her grandchildren, and is employed so that she can continue to assist her family whose financial stability has been affected by her need to pay restitution, the defense urges the court to consider staying a prison sentence and placing Mrs. Sternke on probation for five years with the following

conditions:

1. Impose and stay a period of confinement of 12 months and 3 years extended supervision.

2. Place Mrs. Sternke on probation for a period of five years with conditions:

    a. that she continue to cooperate with the repayment of the restitution.
    b. that she cooperate with the school district in identifying methods she used to divert funds to her use.
    c. that she spend six months on community confinement with release for work and home responsibilities.

For all the reasons stated in this brief, Mrs. Sternke and counsel respectfully urge the Court to consider the sentence structure outlined above, rather than the sentence proposed by the government.

Dated this 27th day of March, 2014.

Respectfully submitted,

BUTING, WILLIAMS & STILLING, S.C.


By:     s/Kathleen B. Stilling
        Kathleen B. Stilling
        State Bar No. 1002998

ADDRESS:
400 N. Executive Drive, #205
Brookfield, Wisconsin 53005
(262) 821-0999   FAX: (262) 821-5599